[No. 27921. Department One. July 15, 1941.]

*In the Matter of the Estate of* EMMA J. TIBBITS,
*Deceased.*

AUGUST CEDERCRANS, *as Administrator, Appellant,* v.
J. T. PRALL, *as Administrator, Respondent
and Cross-appellant.*[1]

*Carl W. Swanson,* for appellant.

*Milton S. Hanauer,* for respondent and cross-appellant.

ROBINSON, C. J.—Emma J. Tibbits died testate March
17, 1934, leaving surviving her, her husband, George

[1]Reported in 115 P. (2d) 381.

Tibbits, a son, Edward Tibbits, and three daughters, Addie Prall, Jessie Turner, and Ruby Bard. By her will, which was admitted to probate, Mrs. Tibbits devised all of her property, real and personal, to her husband for life, remainder in equal shares to her four children.

Edward Tibbits died October 14, 1935, leaving surviving him two daughters. Appellant Cedercrans, husband of one of his daughters, was appointed administrator of his estate. George Tibbits, husband of Emma J. Tibbits, died September 9, 1938. It appears from the court's memorandum opinion—though this does not appear in the evidence—that he left a will making no provision for the two children of his deceased son Edward.

The inventory filed in the estate of Emma J. Tibbits listed among the assets, under the heading: "Bonds, Notes and Accounts Due Deceased," the following:

"From Edward Tibbits by reason of his note, $1700.00
Interest on same....................... 2184.00"

Other indebtedness was claimed to be owing by Edward Tibbits, with which, the cross-appeal not being pressed, we are not here concerned.

J. T. Prall, as the administrator *de bonis non* of the estate of Emma J. Tibbits, filed a final report and petition for distribution praying that the alleged indebtedness of Edward Tibbits be set off or charged upon his share of his mother's estate. August Cedercrans, as executor of Edward's estate, filed objections. A trial was had before the court. The court found that Edward Tibbits, at the time of his mother's death, was indebted to the community estate of his parents in the sum of seventeen hundred dollars, and accrued interest at eight per cent per annum from November 14, 1925, the date to which interest had been paid, and, as the amount exceeded the value of Edward's share,

decreed that the estate be distributed, share and share alike, to Jessie Turner, Addie Prall, and the administrator of the estate of Ruby Bard.

In appealing, Cedercrans, as executor of Edward Tibbitts' estate, makes four contentions, namely:

(1) That the statute of limitations had run;

(2) That, if Edward Tibbits at any time owed his parents seventeen hundred dollars, by reason of his father paying his note, the matter became *res judicata* in an action brought by the administrator of Edward Tibbits' estate against George Tibbits and Ruby Bard, as the then administratrix of Emma Tibbits' estate, in November, 1936, which action was compromised by the defendant paying a sum of money to the plaintiff;

(3) That, if the indebtedness existed as claimed, the parents of Edward were guilty of laches in the collection thereof;

(4) That, in any event, there was not sufficient proof that such an indebtedness existed at the time of Emma Tibbits' death to warrant the allowance of the offset.

There is no merit in the first of these contentions. This was not an action on a note, but a claim to offset an indebtedness. By the weight of authority, this may be done, even though the statute of limitations has run, since the running of the statute merely prevents the bringing of an action; it does not cancel the indebtedness. We have, on that theory, consistently allowed such offsets in the settlement of estates. The reasons for so doing are quite fully set out in the opinion in *In re Smith's Estate*, 179 Wash. 417, 38 P. (2d) 244.

As to the second contention, we need only say that we have examined the files in that action, brought up as exhibits in this cause, as well as the testimony given by the attorneys who represented the parties therein.

We are satisfied that the court correctly ruled that there was no such adjudication in that case.

The third contention, *re* the doctrine of laches, brings into conflict two equitable doctrines; for the right to offset is itself an equitable doctrine. As the note, with respect to which the asserted indebtedness is claimed to have originated, is dated November 14, 1918, and the last interest payment was endorsed on it in November, 1925, and Emma Tibbits lived until March, 1934, and her husband George Tibbits until September, 1938, this contention might, perhaps, be sufficient to call for a reversal of the case; but we prefer to place our decision upon less debatable ground.

 When this inquiry took place, the asserted obligation was very old. No enforcement had been attempted over a period of many years. The parties to the note were, in fact, all dead, and no direct evidence was obtainable. Although the court, in the exercise of its equitable jurisdiction, could disregard the spirit of the statute of limitations and the doctrine of laches, it seems clear to us that it could only rightly do so upon very clear proof that the indebtedness actually existed. We do not find such proof in the record.

We shall endeavor to fully set out and, for the most part, quote, such evidence as there is.

A note for seventeen hundred dollars, dated November 14, 1918, interest at eight per cent per annum, payable to the order of J. W. Prall, but with the signatures torn off, was admitted in evidence after J. T. Prall, administrator of the estate of Emma Tibbits and the husband of one of the Tibbits' daughters, testified that J. W. Prall was his father, and he had seen the note in his father's possession a number of years before, and it then bore the signatures of Edward Tibbits and George Tibbits. He testified that, in 1934, at a time

when Edward Tibbits owed him some money, Tibbits, in volunteering an apology for not paying him, said:

"You know I can't pay it. You know I have not been able to pay my father the note he had to pay your father for me."

This is relied upon as proof of an admission by Edward Tibbits that: (1) His signature was on the note introduced in evidence; (2) that it was his obligation; (3) that his father paid it for him; and (4) that he still owed his father the amount paid. But it in no way identifies the note. There may have been another note between the same parties. This testimony, if properly admitted, concerning which the trial court expressed grave doubt, is of little or no probative force.

Judge Charles W. Greenough, of the superior court of the state of Washington for Spokane county, was called as a witness. He had probated the estate of Emma Tibbits before his election to the bench, and had also been attorney for the defendants George Tibbits and Ruby Bard in the action brought by Cedercrans, hereinbefore referred to. He identified the note, and stated that it was brought to him when he probated the Emma Tibbits' estate. He further testified that he had discussed the instrument and another note with Edward Tibbits, and Edward had admitted that he had signed them. We quote:

"Q. What, if anything, was said as to who paid them—by Ed Tibbits? A. He said that his father paid them, and that was George Tibbits."

This is evidence of an admission by Edward Tibbits that the seventeen hundred dollar note was his obligation and that his father had paid it. It is no admission, however, that he, therefore, owed his father seventeen hundred dollars. We quote from the further examination of Judge Greenough:

420

"BY THE COURT: Q. When that note of $1700 came into your possession were the signatures detached such as you see it now? A. Yes. Q. And the conversations that you had with Edward Tibbits took place about when in respect to the time of his death which occurred in October, 1935? A. It was just a few months before his death, as I recall it. Q. He stated at that time, and on a number of occasions, as I understand it, that he was indebted to his father for the $1700, plus the $900 note? A. *No, he didn't state that, Your Honor. He said on a number of occasions he hadn't paid it in cash, and he didn't state he was indebted to his father. He never admitted he was indebted to his father.*" (Italics ours.)

Later on, the attorney for the Emma Tibbits' estate went briefly into this matter with the same witness:

"Q. Was it admitted by Edward Tibbits sometime prior to his death, to you, that he had not paid his father in cash? A. Yes. He never claimed that he paid it in cash. Q. Did he claim there had been a settlement? A. No, he never claimed that there had been any settlement. All I could get from him was that services he had rendered to his father he had never been given credit for."

Before Judge Greenough left the stand, the trial court again questioned him, apparently being somewhat disturbed concerning the question of laches:

"THE COURT: Q. Being intimate and familiar with the transaction that took place between these various parties, George Tibbits and Edward Tibbits, and Ruby Bard, Cedercrans and the rest of them, what was the reason, if you know, that the father had not asserted his right to collect an indebtedness owing by his son over these long periods of years? A. Well, Your Honor, that goes into the intimate life of Ed Tibbits. Ed Tibbits was the only boy in the family, and he had been at one time his father's pride. He had great hopes of Ed Tibbits being his bulwark to him in his old age. It was a bitter disappointment to him— MR. SWANSON: I think, Your Honor,— THE COURT: I want this in-

formation. I would like to know why he didn't assert the right of collection and you may proceed, Judge Greenough. A. Ed Tibbits was the favorite of his, and his family, because he was the only boy. He was addicted to the excessive use of intoxicating liquor, and had been over a long period of years, and Mr. Tibbits, his father, had just indulged him and worked along with him and had helped him with money— MR. SWANSON: Now, Your Honor— THE COURT: Just a minute; I am asking for this testimony, Mr. Swanson. Please don't interrupt. A. In the hopes and expectation that he would straighten himself out finally and make the returns that George Tibbits felt that he was capable of, and that was the reason, or one reason why there was never any settlement of the account. The second reason was that Ed Tibbits—all of the money that he could get, he spent for other things. THE COURT: Q. Judge Greenough, knowing the facts and circumstances intimately in connection with this indebtedness, what was the attitude of the father in respect to ever intending to make collection of this indebtedness? A. Of course, Your Honor, when I came into contact with the matter, so far as Ed Tibbits was concerned, the statute of limitations had run, and George Tibbits knew that and didn't expect that he would ever be able to realize on that indebtedness. Q. From your testimony I assume it is a fact that the father never expected to collect the indebtedness. A. That is correct. However, he has stated to me frequently that he expected that indebtedness of Ed Tibbits' to be charged against him when it came to a settlement of his estate. MR. SWANSON: We object to that. THE COURT: Q. He expected that to be done? A. Yes. THE COURT: I believe we should always try to get all the facts, regardless of whether it is quite in order or not."

This testimony, in so far as admissible at all, has little or no tendency to prove the issue in the case. It is, of course, direct, positive, and completely trustworthy evidence that the father considered that his son owed him the seventeen hundred dollars paid on

the note, and that he acted consistently with that belief, but it is no evidence at all that he actually owed him that sum. One cannot prove that A owes B by introducing evidence that B says he does, even though there be supporting evidence that B's actions have been consistent with his claim. What is A's version of the matter? We have a very good idea what Edward Tibbits' position would have been had he been living. As already shown, as testified to by Judge Greenough in an answer to a question put to him by the court, Edward Tibbits, just before his death,

" . . . didn't state he was indebted to his father. He never admitted he was indebted to his father."

And, again, in answer to a question put to him by the estate's attorney, Judge Greenough said:

"All I could get from him was that services he had rendered to his father he had never been given credit for."

There was ample opportunity for the creation and existence of mutual, unsatisfied demands between father and son. Mrs. Ida Rice was the wife of Edward Tibbits between 1918, the year the note was made, and 1925, the date of the last interest endorsement. She testified that, during that period, her then husband and his father were wheat farming on shares. The father handled the finances when the crop was harvested. They deducted the expenses and divided the profits. The father attended to the banking and gave Edward his share by check. In good years, the farm was very productive, and they bought considerable machinery with which to operate. Early during this period, they borrowed seventeen hundred dollars from a bank, which she thought they repaid in 1922. Part of the time there was a written lease, and part of the time their arrangements were oral. In some particulars,

her testimony was corroborated by her daughter who was thirteen years old in 1918.

It was the estate which asserted the right to offset, and, therefore, its burden to affirmatively prove the fact that the indebtedness existed at the time of the death of Emma Tibbits. In our opinion, the evidence concerning its then existence, all of which we have noted and almost all of which we have quoted, falls far short of warranting the application of the equitable doctrine of offset.

The cross-appeal is denied, and it is directed that the decree appealed from be set aside and a new decree entered not inconsistent herewith.

MAIN, MILLARD, and SIMPSON, JJ., concur.

BLAKE, J. (dissenting)—That George Tibbits paid Edward Tibbits' indebtedness to J. W. Prall, there can be no doubt. To my mind, there is more than a doubt that Edward ever reimbursed George. Payment is an affirmative defense, and the burden is on the defendant to establish it by a preponderance of evidence. *Pickle v. Anderson,* 62 Wash. 552, 114 Pac. 177; *Palmer v. Parker,* 91 Wash. 683, 158 Pac. 1017. By its judgment, the trial court obviously concluded that payment had not been established. I do not think that a different conclusion can be said to be sustained by a preponderance of the evidence. I therefore dissent.